UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦

**TINA M. ROSA,**

                                **Plaintiff,**

                  **-v-**                                      **5:04-CV-581**

**THE JEWISH HOME OF CENTRAL
NEW YORK,**

                                **Defendant.**

✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦

APPEARANCES:

Tina M. Rosa
Plaintiff, *pro se*

Bond, Schoeneck & King, PLLC
Christa J. Richer, Esq., of Counsel
One Lincoln Center
Syracuse, New York 13202
Attorneys for Defendant

**Hon. Norman A. Mordue, Chief U.S. District Judge**

### MEMORANDUM-DECISION AND ORDER

### INTRODUCTION

In her *pro se* complaint, filed May 21, 2004, plaintiff, who is Hispanic, sets forth claims under 42 U.S.C. § 1983 and the Civil Rights Act, 42 U.S.C. § 2000e ("Title VII"). She alleges that defendant wrongfully terminated her employment because of her race and/or national origin.

Defendant moves (Dkt. No. 21) for summary judgment under Rule 56 of the Federal Rules of Civil Procedure. Included in defendant's motion papers is a notice adequately explaining the nature of summary judgment proceedings. *See Vital v. Interfaith Med. Ctr.*, 168 F.3d 615, 620-21

(2d Cir. 1999). Defendant submits proof of service on plaintiff both at her record address and at the address given in her subsequent notice of change of address (Dkt. No. 22). Plaintiff has submitted no opposing papers.

## FACTS

**Background**

Defendant is a private, not-for-profit organization. On April 21, 2002, plaintiff began probationary part-time employment with defendant as a Certified Nursing Assistant ("CNA"). On May 6, 2002, after a two-week orientation period on the day shift (7 a.m. to 3 p.m.), plaintiff was assigned to work the evening shift (3 p.m. to 11 p.m.) on the second floor of defendant's facility. Iris Dixon, a Licensed Practical Nurse ("LPN"), was Charge Nurse for the evening shift, second floor. As such, Dixon directed the work assignments of the CNAs on her floor and shift. She did not, however, hold a supervisory position.

In a letter to Sydney Pringle, defendant's Director of Human Resources, dated May 10, 2003, plaintiff asked to be changed to the day shift, complaining of the nature of the tasks she was assigned, apparently by Dixon. The following day, plaintiff met with Pringle to discuss her request. Pringle told plaintiff that under the union contract, shift assignments were made by seniority, and that he would let her know if an opening on another shift became available. Plaintiff continued to be assigned to the second floor, evening shift.

Plaintiff later met with Pringle again to ask whether there was an opening on a different shift; there was not. According to plaintiff's deposition testimony, plaintiff did not tell Pringle at either meeting that Dixon discriminated against her, nor did she complain about anyone else.

On June 7, 2003, an incident occurred in which Dixon claimed that plaintiff had not cared

-2-

for a resident as directed. Dixon further claimed that when confronted with the situation, plaintiff became argumentative and upset the resident. Dixon prepared a report of the incident and submitted it to Pringle and Helen Mahoney, Assistant Administrator and Director of Nursing. As will be discussed below, plaintiff disputes Dixon's version of the June 7, 2003 incident.

On June 9, 2003, Pringle and Mahoney met to discuss Dixon's report concerning the June 7, 2003 incident. According to Pringle, upon reviewing plaintiff's personnel file, they learned that plaintiff's period of employment from May 6, 2003 to June 7, 2003 "was plagued with attendance problems and other performance deficiencies." Pringle and Mahoney decided to terminate plaintiff, who was still a probationary employee.[1]

On June 9, 2003, Mahoney telephoned plaintiff and told her that she was terminated. On the following day, plaintiff met with Pringle and reviewed her personnel file. According to plaintiff, the file contained Dixon's report concerning the June 7, 2003 incident, and four other "write-ups"; plaintiff had not seen or been told about any of these complaints.

**Administrative charge**

In her administrative charge, filed July 8, 2003, plaintiff states:

In May, 2003, I met with Sid Pringle, the respondent's Director of Human Resources. I requested this meeting after I realized that one of the respondent's nurses, known to me as Iris, was biased toward me because of my race and color. I explained to Mr. Pringle that Iris did not afford me the same professional courtesy and respect she gave to non-Hispanic subordinates. Mr. Pringle said that he would look into providing me with a transfer onto a different shift as soon as any openings became available.

I was never offered any change of shift after I spoke with Mr. Pringle in May, 2003. On or about June 6, 2003, Iris told me that she had written me up on one incident but when I went to Mr. Pringle to review this write-up, I discovered that Iris had placed 4 more

---

[1] Under the applicable labor agreement, the probationary period for part-time employees was 45 actual work days.

-3-

written warnings in my file which I had never before seen nor been told about. I advised Mr. Pringle that I had never seen the 4 additional write-ups and he agreed that I should have been told about them. Nevertheless, on June 9, 2003, I received a call at home from Helen Mahoney in scheduling who informed me that the respondent had terminated my employment because of the write-ups and my attitude.

Based on the foregoing, I believe that Mr. Pringle did not look into my charges of racial prejudice because of my race and color and Mr. Pringle's failure to investigate and correct this problem resulted in my loss of employment. Therefore, I can only conclude that the respondent's management endorses a policy of discrimination perpetrated against Hispanic subordinates.

(Paragraph numbering omitted.)  She adds: "I also think [I was discriminated against] because while getting on the elevator [after the June 7, 2003 incident], I heard Iris [Dixon] say to another CNA that 'no wonder, all spics are stupid.'"

**District Court complaint**

Plaintiff's complaint before this Court, filed on May 21, 2004, alleges:

I was fired because of my race/national origin. On June 7th 2003 I was working at the Jewish Home from 3pm to 11 pm.  At 11pm the charge nurse called the supervisor up to the floor.  I was at the time clock when the supervisor came up to me and told me to go back on the floor to clean a resident up.  I did what she said and as I was leaving the charge nurse Iris Dixon had told the CNA or another nurse on the floor that all Spics are stupid.  Then the 9th of June I got a call saying I was fired and not to come to work.  The next day I went to see what was going on and I had 5 writeups which I had no knowledge of.

### THE MOTION

On the motion for summary judgment, defendant submits an affidavit from Iris Dixon, LPN, explaining that, as Charge Nurse at defendant's facility on the evening shift, she oversaw the nursing care provided and directed the CNAs on that shift.  She did not hold a supervisory position and had no authority to hire, fire, discipline or evaluate employees.  Dixon describes in detail the problems she had with plaintiff, including disrespectful and hostile conduct toward the staff and residents, unreliability, and failure to provide timely care to residents.  Dixon states that

-4-

two residents refused to allow plaintiff to clean them because she was "too rough."

In her affidavit, Dixon describes the incident of June 7, 2003, as follows:

At approximately 9:00 p.m., I was attending to a resident with the initials R.S.  Upon discovering that the resident was wet, I contacted Ms. Rosa and directed her to clean the resident.  Later that evening, a few minutes before the end of the evening shift, I checked on R.S. again and discovered that although he had on a clean depends, his bed pad and sheets were urine-soaked and encircled with dark yellow rings.  Thus, I concluded that Ms. Rosa had failed to change the resident's urine-soaked bed linens as I had requested earlier in the evening.  I learned that Ms. Rosa had already left the floor to clock out for the evening.  I contacted Roberta Novak, one of the Jewish Home's RN Supervisors who was working that evening, and asked her to tell Ms. Rosa to return to the second floor to attend to R.S.

Ms. Rosa returned to the second floor with a hostile attitude, yelling at me and demanding that I show her the problem with the resident.  As we approached R.S.'s room, Ms. Rosa continued to berate me, became verbally abusive and yelled obscenities loud enough for others in the surrounding area to hear her.

According to Dixon, when she showed plaintiff that R.S.'s bed pad and sheets were wet, plaintiff continued to yell profanities while standing in R.S.'s room, upsetting him.  To avoid upsetting him further, Dixon asked plaintiff to accompany her out of the room.  Plaintiff's argumentative behavior continued, prompting Dixon to contact Roberta Novak, the RN Supervisor, who came to the second floor and spoke with plaintiff.  Later that night, Novak advised Dixon to write a formal statement detailing the incident, which she did.  The statement, which Dixon submitted to Pringle, Mahoney and Novak, is consistent with Dixon's affidavit.

Defendant also relies on an affidavit from Helen Mahoney, Assistant Administrator and Director of Nursing.  Mahoney was responsible for overseeing the operations of nursing care, hiring and firing employees in the Nursing Department, and ensuring that the staff met the facility's attendance requirements and performance standards.  Mahoney's affidavit describes plaintiff's attendance problems, including being absent on her first scheduled day of work and

-5-

arriving late on three occasions. Mahoney was not aware of plaintiff's race and/or national origin, and plaintiff never complained to her about discrimination by Dixon or anyone else.

Defendant further submits an affidavit from Sydney Pringle, defendant's Director of Human Resources. Pringle was responsible for hiring new employees and terminating probationary employees who failed to meet the facility's standards. On June 9, 2003, Pringle met with Mahoney to discuss Dixon's report concerning the June 7, 2003 incident. Upon reviewing plaintiff's personnel file and learning of plaintiff's other problems and other performance deficiencies, they decided to terminate plaintiff's employment. Dixon did not participate in the decision-making process. At no time did plaintiff complain to Pringle that Dixon or anyone else had used ethnic slurs or acted in a discriminatory manner. Pringle did not know that plaintiff was Hispanic. More than half of the employees in the bargaining unit were minorities.

**Plaintiff's deposition testimony**

When she was deposed on February 18, 2005, plaintiff testified that Pringle hired her as a part-time employee at defendant's facility on the 3 p.m. to 11 p.m. shift; that Pringle told her she would be on probation for 45 actual work days; that on May 10, 2003, she wrote a letter to Pringle requesting to be placed on a different shift; that the next morning Pringle met with her to discuss her request; that during that meeting she told them she had made the request "because [she] was always putting the stuff in the cupboard or in the bed stands" and that "the problem was [that she] was supposed to be with the residents"; that at that meeting she made no complaint about Mahoney; and that at that meeting her only complaint about Dixon was that, although in fact plaintiff had completed orientation, Dixon made her stock shelves and told her she was still on orientation. When asked whether she told Pringle that she felt she had been discriminated

against, plaintiff responded:

> No. That night I didn't feel I was discriminated. I was just doing the stocking and cleaning off the tables and everything for the whole night. Then when I was off the orientation they said I would get my own residents assigned to me and she just gave me the stocking and cleaning off and all the other stuff.

Plaintiff further testified that she met with Pringle on one other occasion "to check on the shifts," and again did not tell him she felt discriminated against. She said that she never complained to Pringle about racial or national origin harassment or discrimination by Dixon or anyone else, and that she never had a problem with any co-employee or supervisor except Dixon.

When asked about the incident on June 7, 2003, plaintiff testified in substantial detail to the effect that she had cleaned the resident and changed the bed shortly before her shift ended at 11 p.m. She stated that, when she was called back from the time clock at about 11 p.m., she found that the resident was clean and dry, but that someone had wet the pad under him with apple juice. She denied having raised her voice or created a disturbance that evening.

Plaintiff testified that she heard Dixon use the word "spic" on about ten occasions. Plaintiff further stated that as she was leaving the floor after the June 7, 2003 incident, she heard Dixon say, "No wonder, all spics are stupid."

When asked how Dixon discriminated against her, plaintiff testified in part:

> I think I told you before, when I went on lunch breaks and stuff she was telling me I was a couple minutes late or like an hour late, that I was taking breaks too early or I was on a different floor, and I was never on a different floor. I took my breaks at the time I was supposed to take them, unlike she did. She took like an hour break and she would add another half hour to it so she would have an hour and a half.

An exhibit at the deposition was a statement plaintiff had obtained from another CNA who stated that Dixon "was always on Tina Rosa's back." And, apparently referring to the June 7, 2003 incident, the CNA stated that Dixon had said that the resident's bed was wet when in fact it

-7-

was not. According to plaintiff, the CNA would have known this because she had helped plaintiff clean the resident and change his bed shortly before 11 p.m.

Plaintiff testified that she complained to Mahoney about the breaks Dixon was taking, but not about anything else; that she did not complain to any other supervisor about Dixon or anything else; and that she does not feel that anyone else other than Dixon discriminated against her.

Plaintiff further testified that at about noon on June 9, 2003, Mahoney telephoned her and told her not to come to work because she had been terminated; that on the same day she went to Pringle's office to ask why she had been terminated; that Pringle showed her her file, which contained five "write-ups"; and that she had never known about any of them before. She said she told Pringle about Dixon's "spic" comments, and he said he would "check into it." She also stated that Pringle did not know that she was Hispanic when he hired her, but that he learned of her ethnic background after he hired her and before he terminated her.

## DISCUSSION

**Summary judgment**

A party moving for summary judgment bears the initial burden of demonstrating that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56 (c); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the Court, viewing the evidence in the light most favorable to the nonmovant and drawing all reasonable inferences in nonmovant's favor, determines that the movant has satisfied this burden, the burden then shifts to the nonmovant to adduce evidence establishing the existence of a disputed issue of material fact requiring a trial. *See Ramseur v. Chase Manhattan Bank*, 865 F.2d 460, 465 (2d Cir.1989). If the

nonmovant fails to carry this burden, summary judgment is appropriate. *See Celotex,* 477 U.S. at 323.

Where an opposing party completely fails to respond to a summary judgment motion, Rule 56(e) permits judgment for the moving party only if appropriate – that is, if the motion demonstrates that there is no genuine issue of material fact and that the movant is entitled to judgment as a matter of law. *See Guardado v. Nassau Co. Corr. Facility*, 160 Fed.Appx. 66, 67 (2d Cir. 2005) (citation and internal quotes omitted).

**42 U.S.C. § 1983**

Defendant first seeks dismissal of so much of the complaint as asserts a claim under 42 U.S.C. § 1983. A section 1983 claim "has two essential elements: (1) the defendant acted under color of state law; and (2) as a result of the defendant's actions, the plaintiff suffered a denial of her federal statutory rights, or her constitutional rights or privileges." *Annis v. County of Westchester*, 136 F.3d 239, 245 (2d Cir. 1998). Defendant points out that it is a private non-profit organization, and there is no basis to find that defendant acted under color of state law. The Court agrees, and this portion of defendant's motion is granted.

**National origin discrimination**

Defendant also seeks dismissal of so much of plaintiff's Title VII claim as alleges national origin discrimination. Prior to bringing a Title VII claim in district court, a plaintiff is required to exhaust administrative remedies. *See Deravin v. Kerik*, 335 F.3d 195, 200 (2d Cir. 2003). If a plaintiff fails to pursue a particular claim before the administrative agency, the district court will generally lack jurisdiction to adjudicate it. *See Fitzgerald v. Henderson*, 251 F.3d 345, 359 (2d Cir. 2001). The court will, however, have jurisdiction over an unexhausted claim if it is

"reasonably related" to a claim that the plaintiff did assert before the agency. *See id.*

A review of her administrative charge shows that plaintiff claimed racial discrimination, but not national origin discrimination. Plaintiff testified that she is Hispanic and was born in the United States. On the facts of the instant case, plaintiff's designated race of "Hispanic" does not indicate a nation of origin. Thus, plaintiff's claim of national origin discrimination is not reasonably related to her claim of racial discrimination. *See Deravin*, 335 F.3d at 201-02. Indeed, from her deposition testimony, it appears that plaintiff did not intend to pursue a claim of national origin discrimination. This aspect of defendant's motion is granted.

**Title VII –** *Prima facie* **case**

The Court analyzes plaintiff's Title VII racial discrimination claim under the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04 (1973), which first requires the plaintiff to prove, by a preponderance of the evidence, a *prima facie* case of discrimination by the employer. *See Bickerstaff v. Vassar College*, 196 F.3d 435, 446-47 (2d Cir. 1999). To establish a *prima facie* case, plaintiff must show that (1) she is a member of a protected class; (2) she was qualified for the position; (3) she suffered an adverse employment action; and (4) the action occurred under circumstances giving rise to an inference of discrimination. *See Slattery v. Swiss Reins. Am. Corp.*, 248 F.3d 87, 91 (2d Cir. 2001). The burden of establishing a *prima facie* case is "minimal." *See St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506 (1993).

To satisfy the second element of the test, a plaintiff need only possess the basic skills necessary for performance of the job. *See Slattery*, 248 F.3d at 92 ("[A]ll that is required is that the plaintiff establish basic eligibility for the position at issue, and not the greater showing that he

-10-

satisfies the employer."). Here, the second element of the *prima facie* case is satisfied by the undisputed facts that plaintiff was trained as a CNA and that she was hired for the position. Moreover, plaintiff adduces evidence to the effect that she performed her duties properly and that defendant's dissatisfaction with her performance stemmed not from unsatisfactory performance but rather from Dixon's racial animus.

With respect to the fourth element – whether the termination occurred under circumstances giving rise to an inference of discrimination – plaintiff's protected status, her basic qualifications for the position, and her allegations of Dixon's derogatory comments about Hispanics are sufficient to meet this minimal burden.

**Title VII – Non-discriminatory reason for employer's actions**

In the second step of the *McDonnell Douglas* test, the burden of production shifts to the employer to articulate a legitimate, nondiscriminatory reason for its actions. *See Bickerstaff*, 196 F.3d at 446. The defendant's burden of production is not a demanding one; it need only offer an explanation for the employment decision. *Id.* A review of the affidavits of Dixon and Mahoney establishes that defendant has amply met its burden.

**Title VII – Pretext**

In the third step of the *McDonnell Douglas* process, the burden shifts back to the plaintiff. The plaintiff then has the opportunity to demonstrate "that the proffered reason was not the true reason for the employment decision, and that race was." *St. Mary's*, 509 U.S. at 508 (internal quote omitted). "The plaintiff's opportunity to demonstrate that the employer's proffered reason was false [then] merges with her ultimate burden to persuade the trier of fact that she has been the victim of intentional discrimination (i.e., that an illegal discriminatory reason played a

-11-

motivating role in the adverse employment decision)." *Bickerstaff*, 196 F.3d at 446-47.

Even though plaintiff has not submitted opposing papers, a review of the evidence, including plaintiff's administrative charge, her federal complaint, and her deposition testimony, persuades the Court that the record evidence is sufficient to meet this burden. Defendant argues that it has shown that plaintiff's performance was frequently unsatisfactory and that her behavior was inappropriate, unprofessional and disruptive to defendant's staff and residents, thus establishing that defendant's reasons for plaintiff's termination were not pretextual. The countervailing evidence favoring plaintiff, however, raises questions of fact with respect to these matters. Plaintiff alleges that she performed her job properly and that Dixon repeatedly criticized her unjustly for being late or on a different floor. Plaintiff claims that on the night of June 7, 2003, she had properly cleaned the resident and changed his sheets, and that when she was called back by Dixon, the resident was still clean but someone (presumably Dixon) had tampered with the bedsheets to make it appear that plaintiff had not changed them. Plaintiff also alleges that on many occasions Dixon referred to Hispanics as "spics" and, at the close of the June 7, 2003 incident, said, "No wonder, all spics are stupid."

While plaintiff's suggestion that Dixon poured apple juice on R.S.'s sheets in order to "frame" plaintiff borders on the incredible, *see Higazy v. Millennium Hotel and Resorts*, 346 F.Supp.2d 430, 458 (S.D.N.Y. 2004) ("implausible evidence that a reasonable person would not believe may be disregarded"), the Court finds that, viewed as a whole, plaintiff's administrative charge, federal complaint, and deposition testimony are sufficient to raise questions of fact regarding plaintiff's job performance and general conduct.

Moreover, although plaintiff clearly states in her deposition that she never told Pringle or

-12-

Mahoney about Dixon's allegedly discriminatory conduct, defendant has not ruled out the possibility that a fact-finder could conclude that Dixon's alleged bias should be imputed to defendant on the ground that her report played a substantial role in the decision to terminate plaintiff. *See generally Sadki v. SUNY Coll. at Brockport*, 310 F.Supp.2d 506, 513-14 (W.D.N.Y.2004), *and cases cited therein*; *see also Maarouf v. Walker Mfg. Co., Div. of Tenneco Automotive*, 210 F.3d 750, 754 (7th Cir. 2000) (stating that a subordinate's bias may be imputed to the decision-maker where the subordinate, by concealing relevant information or by providing false information, is able to influence the job decision).

Accordingly, the Court finds that defendant has not satisfied its initial burden on this summary judgment motion of demonstrating that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law.

## CONCLUSION

It is therefore

ORDERED that defendant's motion for summary judgment (Dkt. No. 21) is granted insofar as it seeks dismissal of plaintiff's claim under 42 U.S.C. § 1983 and so much of plaintiff's Title VII claim as alleges national origin discrimination, and otherwise denied.

IT IS SO ORDERED.

September 22, 2006
Syracuse, New York

_____
Norman A. Mordue
Chief United States District Court Judge